# United States Court of Appeals for the Fifth Circuit

———————

No. 25-30078

———————

United States Court of Appeals
Fifth Circuit

**FILED**

July 24, 2026

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

ADRIAN DEXTER TALBOT, *Medical Doctor*,

*Defendant—Appellant*.

———————————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:21-CR-111-1

———————————————————————

Before RICHMAN, DUNCAN, and OLDHAM, *Circuit Judges*.
PER CURIAM:[*]

A jury convicted Adrian Dexter Talbot of seven counts related to prescribing controlled substances without a legitimate medical purpose and outside the course of professional practice. On appeal, Talbot challenges his conviction on several grounds. We affirm.

———————————————

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 25-30078

I

Adrian Dexter Talbot is a physician based in Louisiana. In 2010, he established Medex Clinical Consultants, PLLC ("Medex"), a private medical practice in Slidell, Louisiana. Talbot sought to "provid[e] care to patients with pain and addiction-related disorders." Five years after Talbot opened his practice, he accepted a full-time position as Chief of Medicine at the Veterans Affairs ("VA") Medical Center in Alexandria, Louisiana. That hospital was approximately a 3.5-hour drive from Slidell, so Talbot went to Medex about once a week.

The Medex staff continued to operate the clinic in Talbot's absence. But they were not authorized to prescribe controlled substances to patients. So Talbot would "fill out, print, sign, and store controlled-substance prescriptions in the clinic" for his staff to hand to patients. That way, Talbot could prescribe controlled substances without any authorized practitioner seeing the patients.

Talbot's absence and prescribing system concerned his staff. One nurse practitioner soon resigned. Talbot hired two nurse practitioners to replace him, but neither replacement nurse could prescribe controlled substances for long-term chronic pain management. Staff later testified that they conducted all patient visits and rarely saw Talbot. They also testified that prescriptions were mostly for doses "significantly higher than what [one] would normally use" for treatment. Staff noticed drug-seeking behaviors from patients—including lining up outside the clinic long before it opened, calling the clinic to ask for prescription increases, and selling prescriptions.

In 2016, Talbot hired Dr. Anil Prasad to sign controlled substance prescriptions for Medex's patients. Prasad would sign the pre-filled prescriptions the day before patients arrived at the clinic. Prasad later

testified that he thought up to 90 percent of the prescription dosages were "too high," but signed them anyway.

All told, from February 2015 to August 2016, Talbot wrote over 14,000 prescriptions for controlled substances to Medex patients while working full time at the VA. Combined with the prescriptions issued after Prasad joined, the number of prescriptions totaled at least 1.2 million pills. This is an "extremely conservative" estimate.

Following a federal investigation, Talbot was indicted for the following offenses: conspiring to unlawfully distribute and dispense controlled substances in violation of 21 U.S.C. § 846 (Count 1); unlawfully distributing and dispensing a controlled substance in violation of 21 U.S.C. § 841(a)(1) (Counts 2–5); maintaining a drug-involved premises in violation of 21 U.S.C. § 856(a)(1) (Count 6); and conspiring to commit health care fraud in violation of 18 U.S.C. § 1349 (Count 7). A jury convicted him on all counts. The district court sentenced Talbot to 87 months' imprisonment.

## II

Talbot brings several challenges to his conviction: (A) that he was not competent to stand trial; (B) that the district court should have dismissed Count 6; (C) that there was insufficient evidence to convict him; and (D) that the district court made a slew of errors at trial. We discuss each in turn.

## A

The first issue is whether the district court erred in finding Talbot competent to stand trial and denying Talbot a third competency hearing. We review a district court's competency determination using a "species of clear error review." *United States v. Porter*, 907 F.3d 374, 380 (5th Cir. 2018) (quotation omitted). The court "take[s] a hard look at the facts to determine

whether the [] competency finding was clearly arbitrary or unwarranted." *United States v. Pervis*, 937 F.3d 546, 554 (5th Cir. 2019) (quotations omitted). We will not "relitigate the battle of the experts." *Id.* (quotation omitted).

The district court's decision was not clearly arbitrary or unreasonable. The court conducted a comprehensive assessment of Talbot's medical records, expert reports, and testimony from Talbot's loved ones. *See Porter*, 907 F.3d at 380–82. Only after thoroughly examining the evidence did the court conclude that Talbot's supposedly severe dementia symptoms were the result of malingering.

The district court pointed to a slew of evidence: expert findings that Talbot's performance on cognitive tests was "atypical of what would be expected" from a dementia patient; expert findings that Talbot's supposed memory loss "was most profound when discussing the charges" against him, which supported a finding of malingering; expert findings that Talbot's test results, at most, supported a diagnosis of mild cognitive impairment, which would not place his functioning below the competency level; the fact that none of Talbot's treating physicians before 2022 conducted any dementia testing, and most of his diagnoses or indications came from self-diagnosis, a co-conspirator's diagnosis, or references to dementia that were "carried forward from prior providers" not supported by cognitive testing; and testimony from Talbot's wife that he was "still physically active, walking several miles and doing hundreds of push-ups daily," and could be left alone for weeks at a time. In light of this evidence, the district court's determination was not clearly arbitrary or unwarranted.

Talbot's responses are unavailing. To the extent that he can point to "[s]ome" evidence of cognitive decline, that is not enough to upset the district court's determination. *See Porter*, 907 F.3d at 381. And insofar as Talbot critiques individual experts' methodology and testing, that is the kind

of war-of-the-experts that he cannot relitigate on appeal. *Pervis*, 937 F.3d at 554.

The district court also did not abuse its discretion in denying Talbot a third competency hearing. *See United States v. Flores-Martinez*, 677 F.3d 699, 706 (5th Cir. 2012). Under federal law, "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent," the district court must provide a competency hearing. 18 U.S.C. § 4241(a). As the Government points out, Talbot does not allege that he has any history of irrational behavior or that his demeanor at trial indicated "reasonable cause" for a third competency hearing. *See United States v. Messervey*, 317 F.3d 457, 463 (5th Cir. 2002). And the district court considered the medical opinions from all previous competency hearings before determining that Talbot's new report did not indicate any "discernible worsening" in his condition. *See id.* We therefore reject Talbot's arguments.

B

Talbot next contends that the district court should have dismissed Count 6, which charged him with maintaining Medex "for the purpose of distributing . . . controlled substances outside the usual course of professional practice and without a legitimate medical purpose." *See* 21 U.S.C. § 856(a)(1). Both in the district court and here, Talbot argues that § 856(a)(1) cannot apply to him because it does not criminalize "dispens[ing]" controlled substances. By criminalizing distributing rather than dispensing, Talbot argues, Congress did "not extend prosecution under Section 856(a)(1) to practitioners and the[ir] medical facilities." We review the district court's determination *de novo*. *See United States v. Cline*, 986 F.3d 873, 875–76 (5th Cir. 2021).

No. 25-30078

The Controlled Substances Act defines "dispensing" and "distributing" as follows:

- Dispense: "[T]o deliver a controlled substance to an ultimate user . . . by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance."
- Distribute: "[T]o deliver (other than by administering or dispensing) a controlled substance or a listed chemical."

21 U.S.C. §§ 802(10), (11). To Talbot, if "dispensing" includes a doctor's prescribing of controlled substances, and "distributing" excludes "dispensing," then the two terms are mutually exclusive. A doctor's prescribing decisions cannot fall under the term "distributing."

This argument is foreclosed by circuit precedent. Dispensing under the Act requires a prescription issued "pursuant to the lawful order of" a practitioner. *Id.* § 802(10). So when a practitioner issues a prescription "for other than a legitimate medical purpose and not in the usual course of medical practice," our court has held that that prescription is no longer issued "pursuant to [a] lawful order." *United States v. Harrison*, 651 F.2d 353, 354 & n.1 (5th Cir. 1981) (quotation omitted); 21 U.S.C. § 802(10). Thus, a practitioner's unlawful issuance of a prescription can fall outside the Act's definition of "dispense" and within the definition of "distribute." *Harrison*, 651 F.2d at 354 & n.1. Consistent with this analysis, this court has stated that "[a] licensed medical doctor can be prosecuted for the distribution or dispensation of Schedule II controlled substances outside the usual course of professional practice." *United States v. Dunbar*, 614 F.2d 39, 41 (5th Cir. 1980) (per curiam); *see also Harrison*, 651 F.2d at 354 n.1 ("We do not [think] . . . a doctor acting unlawfully and for other than a legitimate medical purpose . . . can only be indicted for dispensing."); *United States v. Craig*, 823 F. App'x 231, 239–41 (5th Cir. 2020) (per curiam) (walking through this

6

issue). And we have regularly upheld doctors' convictions for both unlawfully dispensing and distributing controlled substances. *See, e.g.*, *United States v. Rosen*, 582 F.2d 1032, 1033 (5th Cir. 1978); *United States v. Oti*, 872 F.3d 678, 687–89 (5th Cir. 2017); *United States v. Evans*, 892 F.3d 692, 703 (5th Cir.), *as revised* (5th Cir. July 6, 2018).

This precedent forecloses Talbot's arguments. The Government alleged that Talbot issued over a million doses of controlled substances "outside the usual course of professional practice" and without a legitimate medical purpose. *Dunbar*, 614 F.2d at 41. Under circuit precedent, this qualifies as "distribut[ing] . . . controlled substance[s]" under § 841(a)(1), so it also counts as "distributing . . . controlled substance[s]" under 21 U.S.C. § 856(a)(1).

C

Next, Talbot argues that there was insufficient evidence to support his conviction. When reviewing for sufficiency, we are "highly deferential to the verdict." *United States v. Harris*, 293 F.3d 863, 869 (5th Cir. 2002). This court asks "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Zamora*, 661 F.3d 200, 209 (5th Cir. 2011) (quotation omitted). The inquiry is "limited to whether the jury's verdict was reasonable, not whether we believe it to be correct." *Oti*, 872 F.3d at 686. Here, sufficient evidence supports the jury's verdict on each count.

*Counts 1–5: Controlled Substance Offenses.* Talbot's first sufficiency challenge targets the count charging him with conspiring with Medex employees to unlawfully distribute and dispense controlled substances, in violation of 21 U.S.C. § 846 (Count 1), and the counts charging him with the

underlying substantive crime, in violation of 21 U.S.C. § 841(a)(1) (Counts 2–5).

Talbot argues that the Government did not prove the requisite level of knowledge under *Ruan v. United States*, 597 U.S. 450 (2022). The *Ruan* Court held that in charging a practitioner under § 841(a)(1), the Government must prove that "the defendant knew that he or she was acting in an unauthorized manner, or intended to do so." *Id.* at 454. "The Government, of course, can prove knowledge of a lack of authorization through circumstantial evidence." *Id.* at 467.

Here, the Government did just that. It established that the Louisiana State Board of Medical Examiners requires physicians to conduct in-office visits with patients whom they prescribe controlled substances. It introduced a letter from the VA reminding Talbot of that requirement. And the Government's expert also testified that Talbot had not seen the four patients whose prescriptions formed the basis of Counts 2 through 5. From this evidence, the jury could infer that Talbot knew about the in-person requirement and prescribed controlled substances in violation of it.

The Government provided ample other evidence from which a jury could infer knowledge. Medex employees testified about Talbot's practice of prescribing copious amounts of controlled substances to Medex patients without being seen by a qualified physician. This testimony included details about Talbot filling out, signing, and printing prescriptions in advance of patients' visits and sending them to staff for distribution. For example, nurse practitioner Max Martell voiced his concern that Medex was issuing prescriptions unlawfully because Martell was not credentialed to issue prescriptions and Talbot was not in the office. Talbot just replied that he would "take care of it." Investigators also testified that, after Talbot learned he was under investigation, he amended patients records to make it look as if

he had seen the patients in person; at one point, he even claimed he saw 72 patients in a single day. This all constitutes yet more evidence that Talbot knew that he was acting in an unauthorized manner.

*Count 6: Maintaining a Drug-Involved Premises*. Talbot next argues that there was insufficient evidence to convict him of maintaining a drug-involved premises under 21 U.S.C. § 856(a)(1). Talbot argues that the Government failed to show that illicit drug distribution was a "significant purpose" of Medex. *United States v. Soto-Silva*, 129 F.3d 340, 347 (5th Cir. 1997).

The Government provided ample evidence for a rational juror to infer that Talbot maintained Medex and retained control over its prescribing practices for drug distribution. Medex's supposed Medical Director, Dr. Prasad, testified that Talbot "was in charge of Medex" even after Prasad was hired to serve as the medical director. Prasad testified that Talbot controlled the practice, pre-wrote prescriptions, and "told [Prasad]" to sign them "the day before" or "even two days before" patients were scheduled to arrive. Prasad also testified that almost "every patient that [he] saw was on controlled substances," and roughly "80, 90 percent" of the prescribed regimens that "were too high" for patients' conditions. Further, the Government's expert testified that the prescriptions she reviewed were not written "for [a] legitimate medical purpose or in the usual course of a medical practice." Even Talbot's expert confirmed a majority of Medex patients had controlled-substance prescriptions for a purpose other than addiction treatment or detoxification. From this evidence, a rational juror could conclude that unlawful distribution of controlled substances was a significant purpose of Talbot's Medex facility.

*Count 7: Intent to Defraud Insurers*. Talbot's last sufficiency challenge concerns conspiracy to commit health care fraud in violation of 18 U.S.C.

§ 1349. Talbot argues that the Government failed to prove an "agreement" and "financial motive."

Talbot's argument fails. For one, the Government supplied plenty of evidence of an agreement. The Government established that, at Talbot's direction, Medex stopped accepting insurance in 2015 and required cash payment. But Medex told patients to continue using insurance benefits to fill prescriptions. To ensure that insurance companies covered those prescriptions, Talbot instructed employees to fill out authorization forms that required employees to affirm that they had performed a "complete assessment" on the patients and that the patient would be "closely monitored for the duration of the treatment." In short, Talbot agreed with his employees to submit forms to insurers with false information.

Moreover, Talbot is incorrect that the Government needed to prove a financial motive to convict him of conspiracy to commit health care fraud. *See United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012). But even if such proof were necessary, the Government supplied it. Because Medex's patients were largely below the poverty line, they needed insurance to cover their prescriptions. Thus, Talbot had a financial incentive to defraud the insurance companies.

*

For the foregoing reasons, Talbot's convictions are supported by sufficient evidence.

## D

Talbot alleges several errors at trial: (1) wrongful admission of other-act evidence; (2) erroneous jury instructions; and (3) improper remarks by the prosecutor during closing. We address each in turn.

1

First, the other-act evidence. Talbot objects to the district court's admission of evidence from the VA investigation into his prescribing practices. He contends that the Government used this evidence "to imply guilt by character" and that the district court "curtailed cross examination needed to expose why the VA episode was a non-disciplinary administrative review, not wrongdoing." We review the district court's rulings on admissibility and the scope of cross-examination for abuse of discretion. *United States v. Lim*, 897 F.3d 673, 684 (5th Cir. 2018); *United States v. Ramirez*, 622 F.2d 898, 899 (5th Cir. 1980).

Louisiana medical regulations require patients who are prescribed controlled substances to be seen by a doctor at least every 12 weeks. While Talbot was working at the VA, the hospital concluded in a report that Talbot was not complying with the 12-week rule. VA staff sent that report to Talbot by mistake. Investigators later realized that Talbot modified the inculpatory records after receiving the report. Talbot similarly edited Medex patient records after Medex was served a subpoena for those records.

In light of this backdrop, the Government sought to introduce the VA investigation report to show (1) Talbot's knowledge that prescriptions without in-office visits were outside the course of professional practice and (2) a *modus operandi* by which Talbot would respond to investigations by altering patients' medical records to conceal his malfeasance.

The court did not abuse its discretion in permitting the Government to introduce the VA report for these purposes. Under Federal Rule of Evidence 404(b)(2), the Government may use extrinsic acts to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." By informing Talbot of Louisiana's medical regulations, the investigation supported Talbot's knowledge of the

patient-visit requirement. The Government had to show that Talbot knew that he was prescribing controlled substances outside the course of professional practice. *United States v. Brown*, 553 F.3d 768, 780–81 (5th Cir. 2008). And state medical board regulations "clarify the scope and contour" of the "course of professional practice" element of § 841(a)(1) offenses. *United States v. Bennett*, 874 F.3d 236, 245 (5th Cir. 2017). So the VA report helped show that Talbot's continued issuance of prescriptions without in-person examination was knowingly unlawful.

Similarly, the fact that Talbot "amended" patient records in response to the investigation is relevant to show knowledge, absence of mistake, and a *modus operandi*. The Government sought to prove that Talbot responded to discovery of the federal criminal investigation by amending old patient records. The fact that Talbot did the same thing at the VA shows that he had a "particular *modus operandi*" of responding to investigations. *United States v. Gonzalez-Lira*, 936 F.2d 184, 189 (5th Cir. 1991).

Finally, Talbot objects to the limitations the district court imposed on his cross-examination of Jessica McDermott. McDermott was a former VA employee who reviewed the investigation and conducted a follow-up report. Talbot wanted to argue that he filed a complaint against another provider, Dr. Rivera, and that complaint motivated McDermott's follow-up report. He argues the district court foreclosed this cross-examination. But the record belies this contention. The district court allowed defense counsel to question McDermott about Talbot's misconduct complaint against Rivera. The court just did not let counsel ask whether the hospital disciplined Rivera. That latter line of questioning is irrelevant to Talbot's case, so the district court did not abuse its discretion in limiting cross-examination in this way.

2

Next, Talbot argues that the district court improperly instructed the jury on the elements of a § 841(a) offense. He argues that the instructions failed to comply with *Ruan* because they did not require the jury to find that Talbot knew or intended his prescriptions to be unauthorized. His argument is unavailing.

As discussed above, *Ruan* requires that the Government prove "beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner." *Ruan*, 597 U.S. at 457. That's exactly what the jury instructions here said. They required the jury to find that Talbot "knew he was acting in an unauthorized manner when he dispensed or distributed the controlled substance or intended to act in an unauthorized manner." Because the district court's instructions came straight from *Ruan*, they were not in error.

3

Finally, Talbot claims the prosecutor committed various forms of misconduct during her closing rebuttal. We review claims of prosecutorial misconduct in two steps. First, we ask "whether the prosecutor's remark was legally improper." *United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008). If so, we ask "whether the remark prejudiced the defendant's substantive rights." *Id.* (quotation omitted). Each of Talbot's arguments fails at step one.

a.    Talbot first objects to the prosecutor's remarks about a patient's death. For context: At trial, a Government expert testified about ordinary prescribing practices for treating rheumatoid arthritis. Opioids do not treat rheumatoid arthritis, but Talbot nevertheless prescribed them. During Talbot's defense, he called the widower of a former patient, T.N. During direct examination, Talbot established that T.N. had rheumatoid

arthritis; that Talbot prescribed her opioids; and that the arthritis caused a pulmonary fibrosis, killing T.N. At closing, Talbot's counsel argued that Talbot cared for "his patients out of love." During rebuttal, the prosecutor sought to rebut that contention:

> [I]f [Talbot] loved his patients, why wasn't he treating them? If he loved his patients, why wasn't he seeing them? If he loved his patients, why wasn't he diagnosing, for example, [T.N.] with rheumatoid arthritis that could have been treated with other drugs, as [the Government witness] told you, with the rheumatoid arthritis that [T.N.'s widower] told you caused the pulmonary fibroid that ultimately killed her.

After Talbot's objection, the court instructed the prosecutor to clarify for the jury that "the Government is not saying that Dr. Talbot killed [T.N.]. That is absolutely not the theory of this case. What we're trying to explain to you is that [T.N.] had" rheumatoid arthritis and Talbot "did not give her" treatment for it "the entire time he was with her."

The prosecutor did not commit misconduct. Prosecutors are "confined in closing argument to discussing properly admitted evidence and any reasonable inferences or conclusions that can be drawn from that evidence." *Id.* As the district court found, the statement was "entirely consistent with the evidence presented." Talbot did not prescribe the proper medications to T.N., a patient with severe arthritis. That failure called into question his self-professed love for his patients. Talbot himself also introduced the evidence about T.N.'s death through his questioning of her widower, whom he called as a witness. Thus, the prosecutor's remarks amounted to no more than "a

14

straightforward comment on the evidence." *United States v. Delgado*, 672 F.3d 320, 336 (5th Cir. 2012) (en banc).[1]

b.      Talbot next argues the prosecutor improperly accused defense counsel of "pretend[ing]" the evidence "away." He also objects to the prosecutor's comment that she would show the jury that "every point that [defense counsel] made or relied on required misstating the facts and the evidence, misstating the law."

There was no misconduct. True, a prosecutor may not "impugn the character of defense counsel." *United States v. Diaz-Carreon*, 915 F.2d 951, 958 n.13 (5th Cir. 1990). But the comments here did not come close. She did not personally "attack" defense counsel's "demeanor," "status," or "believability." *Id.* at 958. Instead, her statements were highly "[]relevant to [Talbot's] guilt or innocence." *Id.* The prosecutor simply drew the jury's attention to defense counsel's tactic of ignoring certain record evidence.

c.      Finally, Talbot refers to two additional statements the prosecutor made during rebuttal. Talbot alleges that the Government injected new facts into the trial by suggesting that Talbot modified patient records by accessing Prasad's medical records account. But as the district court explained, this contention is simply false; the prosecutor's argument was grounded in admitted evidence. Talbot also contends that the prosecutor's closing rebuttal invited the jury to infer that he committed records fraud at the VA. That is again false. The prosecutor merely made a point about timing: Talbot's evidence was that he originally saw patients in person at Medex before he went to work at the VA. But as the prosecutor pointed out, "the fact that Dr. Talbot worked at Medex seeing patients

---

[1] The prosecutor did not violate a district court order. The district court only limited references to a different patient's death by accidental overdose.

No. 25-30078

before he went to the VA doesn't clear him of the crimes that he committed while he was at the VA in 2015." This comment had nothing to do with whether Talbot committed records fraud during his time at the VA.

\* \* \*

AFFIRMED.